UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| DWIGHT HARRIS | * | CIVIL ACTION |
| VERSUS | * | NO. 19-13955 |
| SUE ELLEN MONFRA ET AL. | * | SECTION "T"(2) |

## REPORT AND RECOMMENDATION

Plaintiff Dwight Harris is a prisoner currently incarcerated in the Raymond Laborde Correctional Center in Cottonport, Louisiana. He filed this complaint *pro se* and *in forma pauperis* pursuant to 42 U.S.C. § 1983 against ten (10) defendants: Deputies Jody-Lee Banks, Eva Banner, Brian Bordelon, James Glass, Joshua Dennis and Kenyatta Knox; Deputy Chief Sue Ellen Monfra; Chaplin Kathy; Detective Chris Rivers, and Lieutenant T. Berrian. Lieutenant Berrian was listed on the caption of Plaintiff's complaint, however the Clerk of Court neglected to issue a summons to be served on this Defendant through the United States Marshal. ECF No. 1, at 1. By Order issued July 28, 2020 (ECF No. 30), the Clerk of Court was directed to issue a summons (ECF No. 31) to Lieutenant Berrian. Although Plaintiff's written submissions and testimony include claims against Sergeant Adrian Drullet, Officer Coleman, and Deputies T. Holmes and Donald Johnson, he ***does not*** name these individuals as defendants in his complaint and ***has not*** amended his pleadings to add these parties as defendants.

Plaintiff supplemented his complaint by filing a statement of facts, exhibits, and witnesses on January 9, 2020. ECF No. 10. In response to Plaintiff's Motion for Preliminary Injunction and Motion for Leave to File an Amended Complaint (ECF Nos. 12–13), Plaintiff was granted leave to amend his complaint on January 31, 2020. ECF No. 14. In addition, the court held a *Spears* hearing on June 11, 2020.

## I. **BACKGROUND**

### A. **Factual Allegations**

Plaintiff was incarcerated at the Jefferson Parish Correctional Center ("JPCC") on October 1, 2017.  ECF No. 10, at 2.  He was convicted by a jury on April 25, 2019, but his conviction was reversed on December 8, 2019, and the trial judge ordered that Plaintiff be given a new trial.  *Id.*

Plaintiff contends that during his JPCC incarceration, Deputy Brian Bordelon and Chaplin Kathy violated his right to freely exercise his Muslim faith by declaring prayer rugs, prayer beads, and prayer caps "contraband" posing "a substantial threat to the orderly functions" of the prison facility, even though previous JPCC administrations did not consider these religious items contraband.  ECF Nos. 1-1, at 1; 10, at 3.  Plaintiff submitted a written grievance concerning the denial of these religious materials, and Deputy Brian Bordelon responded that these items are a threat to the security and cleanliness of the prison facility.  ECF No. 10, at 2–3.

Plaintiff further alleges that Deputy Jody Lee Banks violated his privacy rights during a cell search on an unspecified date, during which Deputy Banks threw Plaintiff's Quran under a toilet and tossed his legal documents all over the cell.  ECF No. 1-1, at 4.  Deputy Banks issued Plaintiff a disciplinary violation after Plaintiff voiced his "strong discomfort" for the way his cell was searched.  ECF No. 10, at 5.  Plaintiff received a disciplinary hearing before Detective Chris Rivers on September 16, 2019, who dismissed the disciplinary violation based on a "fabricated disciplinary report," but administratively segregated him based on his lack of acknowledgment of Deputy Banks's authority to search inmate cells.  *Id.*; ECF No. 1-1, at 4.

Plaintiff alleges that Detective Chris Rivers and Deputies Bordelon and Eva Banner, as supervisors of the prison disciplinary board, deprived him of "the right to a fair and impartial hearing due to their often arbitrary, capricious and malicious findings, when in fact there is no

taping of the hearings, offenders cannot call witnesses for or against them, often times there's only one person holding the board, and I have always been denied due process, the compulsory and adversarial process." ECF No. 10, at 4. He states that his due process rights were further violated because he did not receive assistance of counsel at his disciplinary hearing. ECF No. 1-1, at 4.

On October 19, 2019, Deputy Joshua Dennis and Sergeant Adrian Drullet removed Plaintiff from his cell during evening roll call. ECF No. 10, at 5. Deputy Dennis belittled and harassed Plaintiff, tackled him to the ground, tased him three times "sadistically and wantonly meaning to inflict pain and discomfort," handcuffed him, and ran his body into walls and doorframes. ECF Nos. 1-1, at 5; 10, at 5. Plaintiff contends that Deputy Dennis' use of force was in retaliation for Deputy Dennis' role in Plaintiff's "fraudulent" and "unlawful" arrest in 2016. *Id.* Plaintiff alleges that Sergeant Drullet failed to protect him from Deputy Dennis' use of force. ECF No. 10, at 5. Deputy Dennis took Plaintiff to the prison booking department and charged Plaintiff with "three additional offenses" without receiving a *Miranda* warning, going through standard intake procedures, or receiving a magistrate hearing. *Id.*

On the night of October 31, 2019, Officer Coleman announced a shakedown of Plaintiff's cell and ordered him to strip down to his boxer shorts, squat, and cough. *Id.* Plaintiff complied with these orders and was handcuffed "to the front" of the cell. *Id.* Deputy T. Holmes was present during the cell search and told Officer Coleman that Plaintiff had "shoulder issues." *Id.* Officer Coleman began violently throwing Plaintiff's legal paperwork and mail around the cell. *Id.* at 6. Plaintiff stated to Officer Coleman: "Come on, Deputy, you don't have to do that." *Id.*

Lieutenant T. Berrian and Deputy Kenyatta Knox were also present during the October 31, 2019 cell search. *Id.* Lieutenant Berrian said to Deputy Knox: "Go and hope he does something stupid." *Id.* After Officer Coleman finished his search, Lieutenant Berrian entered Plaintiff's cell

and tossed his mail, legal paperwork, and pictures around the cell, dropped his Quran on the ground, and stomped on it. *Id.* Plaintiff then stated to Lieutenant Berrian: "You are violating my rights." *Id.*

Deputy Knox "violently shoved" Plaintiff's left shoulder while he was still handcuffed. *Id.* Plaintiff stated to Deputy Knox: "You are hurting me." *Id.* Deputy Knox then pulled a pair of handcuffs from his pocket, struck Plaintiff in the face, and re-broke Plaintiff's nose – on which Plaintiff recently had received facial reconstructive surgery. *Id.*; ECF No. 1-1, at 2–3. Deputy Knox struck Plaintiff in the head, face, and neck. ECF No. 10, at 6. Lieutenant Berrian then "joined in" and struck Plaintiff "unmercifully, unprovoked, unwarranted, sadistically and maliciously intending to inflict pain and suffering." *Id.* Lieutenant Berrian placed Plaintiff in a "chokehold," during which he "almost lost consciousness" and "hit the floor." *Id.*; ECF No. 1-1, at 2–3. Plaintiff was forced to lie down and Lieutenant Berrian straddled his back and struck him in the back of the head and neck with bare hands and/or a baton. *Id.* Deputy Knox uncuffed Plaintiff, and Lieutenant Berrian re-cuffed him "to the rear," while Deputy Knox taunted loudly: "We fucked him up, bitch." ECF No. 10, at 6. Plaintiff was charged with a battery of an officer (Deputy Knox) and resisting arrest by force or violence for the October 31, 2019 incident. *Id.*

Plaintiff was taken to the JPCC infirmary to see a nurse that same night (October 31, 2019), and was tased twice by Deputy James Glass in the infirmary. ECF No. 1-1, at 3. Due to Plaintiff's "excessive amount of blood," the JPCC nurse called a doctor, who ordered Plaintiff's transfer to University Medical Center ("UMC"), where Plaintiff received a CT scan showing that his nose had been rebroken. *Id.*; ECF No. 10, at 6.

Plaintiff attaches to his statement of facts five (5) written statements signed by fellow JPCC inmates who witnessed the October 31st cell search and altercation. Inmate Jourdan Marchese

states that he saw "inmate Dwight Harris get assaulted by Deputy Knox and Lt. T. [Berrian] while inmate Harris was already in handcuffs and detained." *Id.* at 9.

Inmate Byron E. Montgomery, Jr. alleges the following:

On Oct. 31, 2019, I, Byron E. Montgomery Jr. was in my cell, 4AL3B when the staff conducted a search of 4A left side. . . . As the cell next to me on my right side, cell 2AL, was opened, the occupants were handcuffed and ordered to stand to the side. Then without warning or provocation, Dept. Knox began to punch inmate Dwight Harris about the face with unbridled ferocity while shouting, "I *TOLD* you I'd fuck you up!!! I started to shout "He's in *CUFFS*!!! That's cowardly!!! When Lt. Berrian joined up with Dept. Knox in beating the heretofore mentioned inmate Harris, who mind you was handcuffed and posed no threat. Both men continued to pummel inmate Harris until his nose bled profusely. The officers did not stop until inmate Harris laid face down in a puddle of his own blood. This act of extreme cowardice was a disgrace to behold.

*Id.* at 10.

Inmate Joshua Francovich states that he saw deputies, including Deputy Knox, beat and assault Plaintiff on October 31, 2019, while Harris was in "handcuffed" and "innocent," made "no move of assault," and was simply expressing his concern about the other deputies destroying his legal paperwork. *Id.* at 11.

Inmate Brandon Antoine alleges that on October 31, 2019, he witnessed Lieutenant Berrian handcuff plaintiff during a shakedown and Lieutenant Berrian and Deputy Knox attack plaintiff for trying to confront the officers on why his legal mail was getting thrown all over the floor. *Id.* at 12.

Inmate Kevin Stewart states:

"I watched inmate Dwight Harris get shook down but before, he was handcuffed in the front, brought out the cell. Lt. [Berrian] then started getting loud and telling Mr. Dwight to turn and face the cell. In motion of Mr. Dwight turning to face the wall Lt. [Berrian] forced him and grab[bed] him then Officer Knox came from the back of all officers handed the paper paint ball gun to another officer came to the front of Mr. Dwight and started punching him over 20x in the face like he was at a street fight."

5

*Id.* at 13.

Inmate Steven Tate states: "on Halloween night 2019 I witnessed inmate Dwight Harris get brutally beat down while in handcuffs during a shakedown.  I don't know why they beat him like that, but it was really disturbing . . . Those two officers showed no remorse . . . . none of the other officers tried to stop this brutal beatdown."  *Id.* at 14.

Plaintiff's amended complaint alleges additional claims against Defendants for "vexations, harassment, retaliation and psychological abuse . . . no exercise, cold food, hot water, poor air quality, sentenced to admin[istrative] for no rule infraction, feces upon the walls, infestation of roaches, rats, and swarms of gnats; denial to access the social worker or adequate medical attention."  ECF No. 12, at 1.

Plaintiff seeks a federal consent decree against Jefferson Parish Sheriff Lopinto, who is not named as a defendant in this matter, preliminary injunctive relief for JPCC to install security cameras, monetary damages, an investigation into the policies and procedures of the Jefferson Parish Sheriff's Office and JPCC, and transfer to federal custody for his protection.  ECF No. 1-1, at 6–8.

**B.  *Spears* Hearing Testimony**

At the June 11, 2020, telephone conference in this matter, Plaintiff was sworn and testified for all purposes permitted by *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985), *overruled on other grounds by Neitzke v. Williams*, 490 U.S. 319 (1989), and its progeny.  In addition to Plaintiff, Jeffrey Martiny, counsel for Defendants, participated in that conference.

Plaintiff testified that he is a practicing Muslim. He stated that JPCC officials allowed him to practice his religion in prison by reading his personal Quran, engaging in solitary prayer, and –

when he was not in "administrative segregation" – participating in daily, one-hour religious services.

Plaintiff testified that he asked JPCC officials if he could order a prayer rug, prayer beads, and prayer cap from a "third-party, reputable source" who could ship these items to JPCC. Plaintiff stated that he requested these items for use "as a form of religious expression." However, he acknowledged he could still pray and practice his Muslim faith without a prayer rug, cap, and beads. He stated that he submitted his request to Deputy Chief Sue Ellen Monfra, JPCC's "supervising chief"; Deputy Brian Bordelon, the deputy "directly under" Deputy Chief Monfra; and Chaplin Kathy, JPCC's "officiating Christian chaplin." Plaintiff testified that Deputy Chief Monfra, Deputy Bordelon, and Chaplin Kathy all denied his request, stating that the religious articles are "contraband," "unsanitary," "a risk to the safe management of the facility," and a danger to inmates and staff. Plaintiff stated that he submitted a written grievance based on the denial of his request and received a written response from Deputy Bordelon on behalf of Deputy Chief Monfra, reiterating that the religious articles were contraband, unsanitary, and a risk to the JPCC facility, security, and staff. Plaintiff noted that these religious articles were not deemed contraband or a risk to the safe management of the facility during his previous incarceration(s) at JPCC.

Plaintiff stated that, other than denying his religious articles request, Deputy Chief Monfra was not personally involved in any of the events giving rise to his claims in this matter, but rather was sued in her official capacity as supervisor of the other named Defendants.

Plaintiff testified that Deputy Eva Banner and Detective Chris Rivers are the JPCC disciplinary board's "Special Investigative Unit Detectives" who supervised Plaintiff's disciplinary proceedings. Plaintiff testified that he was charged with "a lot" of disciplinary

violations during his JPCC incarceration.  He said he was charged with battery of an officer but could not recall his other disciplinary violations.  In an apparent allusion to the September 16, 2019 disciplinary hearing referenced in his written submissions, Plaintiff said he filed a grievance about a disciplinary hearing, received no response, and was unsure how this grievance was resolved.

Without referencing a particular grievance, Plaintiff stated generally that he did not always exhaust the JPCC grievance procedure because he believes the prison has a "faulty" system and that Deputy Bordelon and Deputy Chief Monfra "never respond" to grievances.  Plaintiff stated that there was "no process for him to respond and tell his side of the story" during disciplinary proceedings.  He said that punishment for his disciplinary violations was placement in "administrative segregation," during which he lost privileges to contact family members and attend daily religious services.  He said that administrative segregation is not punitive in nature and no good time credits were lost during this period.

Plaintiff testified that Deputy Joshua Dennis is a former narcotics officer with the Jefferson Parish Sheriff's Office who arrested plaintiff in 2016 and later worked at JPCC during Plaintiff's incarceration.  Plaintiff testified that on October 19, 2019, Deputy Dennis and Sergeant Adrian Drullet approached his cell and instructed Plaintiff to step out of the cell.  Plaintiff testified that Deputy Dennis looked at him "menacingly" and made profane remarks to him.  Plaintiff stated that Sergeant Drullet told Plaintiff to "back up" and stood between Plaintiff and Deputy Dennis "trying to deescalate the situation."   Plaintiff stated that Deputy Dennis pushed Sergeant Drullet aside and deployed his government-issued taser in Plaintiff's direction.  Plaintiff said that the taser inadvertently shocked Sergeant Drullet's arm, contacted Plaintiff's chest, and shocked Plaintiff after Deputy Dennis squeezed the trigger two or three more times.

Plaintiff testified that Deputy Dennis told him to get on the ground and proceeded to "rough him up badly," placing his knee on Plaintiff's neck and popping Plaintiff's left shoulder out of place. Plaintiff said that, at the time, he had a torn left rotator cuff from a previous injury. Plaintiff stated that Deputy Dennis then handcuffed him and brought him into the hallway. Plaintiff testified that Sergeant Drullet stood by and did not intervene to protect him from Deputy Dennis's use of force. Plaintiff stated that Deputy Dennis instructed his JPCC colleagues to "retaliate" against Plaintiff to deprive him of his constitutional rights.

Plaintiff stated that, following the October 19, 2019 incident, he experiences "daily, excruciating pain" in his left shoulder, recurring dreams about the incident, and psychological distress. He stated that he filed a grievance about the October 19, 2019 incident, received an unsatisfactory response, and then filed the present civil rights lawsuit.

Plaintiff testified that JPCC officers performed "general search" of his cell on October 31, 2019. Plaintiff stated that Officer Coleman handcuffed him to the front of his cell, Plaintiff informed Officer Coleman about his shoulder injury, and Officer Coleman commenced a cell "shakedown." He stated that Lieutenant Timothy Berrian approached Plaintiff's cell and said: "Let me search this asshole down, I know he has something in his cell." Plaintiff said that Lieutenant Berrian tossed around his legal mail and personal effects and stepped on his personal photographs. Plaintiff said he told Lieutenant Berrian: "Sir, that's not necessary, you don't have to do that."

Plaintiff stated that Deputies Kenyatta Knox and Donald Johnson were also present during the October 31, 2019 cell search, and one or both deputies began shoving Plaintiff's left shoulder. Plaintiff said he told the Deputies Knox and Johnson: "You don't have to push me either, I am

handcuffed." Plaintiff said that he complained about his legal mail getting tossed around and was told to "get back to the wall."

Plaintiff said he expressed his frustration to Lieutenant Berrian that the shakedown was ruining his organization of legal documents and personal effects. Plaintiff stated that his "back was on the wall" during the shakedown, but he did peer inside the cell, and Deputy Knox tried to stop him from looking inside his cell. Plaintiff said that Deputy Knox pushed his shoulder back, punched him, broke his nose, and fractured his jaw. He testified that Lieutenant Berrian "ran out" from Plaintiff's cell to join Deputy Knox, and both officers struck him "maybe 40 times." Plaintiff testified that he said nothing to prompt the officers' use of force and was handcuffed during the entire incident.

Plaintiff stated that he was taken to the JPCC infirmary following the altercation, where he was tased by Sergeant James Glass. Plaintiff testified that he was transferred to UMC for medical treatment that night (October 31, 2019). He stated that he suffers constant headaches, sinus problems, trouble sleeping, sleep apnea, and heart palpitations following the October 31st altercation.

Plaintiff said that he was not charged with a disciplinary violation following the October 31, 2019 cell search because no contraband was found. He said he filed a grievance about his October 31, 2019 cell search and the officers' use of force, received no response, and was unsure how this grievance was resolved.

## II.    **LEGAL STANDARD**

A prisoner's *pro se* complaint must be screened by the court as soon as practicable after docketing.[1] Such complaints by prisoners must be dismissed upon review if they are frivolous

---

[1] 28 U.S.C. § 1915A(a); *Martin v. Scott*, 156 F.3d 578, 579–80 (5th Cir. 1998).

and/or fail to state a claim.[2]  "A federal court may dismiss a claim *in forma pauperis* 'if satisfied that the action is frivolous or malicious.'"[3]  A complaint is frivolous "if it lacks an arguable basis in law or fact."[4]  The law "'accords judges not only the authority to dismiss a claim based on an indisputably meritless legal theory, but also the unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless.'"[5]

The purpose of a *Spears* hearing is to dig beneath the conclusory allegations of a *pro se* complaint, to ascertain exactly what the prisoner alleges occurred and the legal basis of the claims.[6]  "[T]he *Spears* procedure affords the plaintiff an opportunity to verbalize his complaints, in a manner of communication more comfortable to many prisoners."[7]  The information elicited at such an evidentiary hearing is in the nature of an amended complaint or a more definite statement under FED. R. CIV. P. 12(e).[8]  "Upon development of the actual nature of the complaint, it may also appear that no justiciable basis for a federal claim exists."[9]

The court may make only limited credibility determinations in a *Spears* hearing, and may consider and rely upon documents as additional evidence, as long as they are properly identified, authentic and reliable.[10]  "The Court should allow proper cross-examination and should require that the parties properly identify and authenticate documents.  A defendant may not use medical records to refute a plaintiff's testimony at a *Spears* hearing."[11]  However, "'[m]edical records of

---

[2] 28 U.S.C. § 1915A(b)(1); *see also id.* § 1915(e)(2)(B).

[3] *Moore v. McDonald*, 30 F.3d 616, 620 (5th Cir. 1994) (quoting former 28 U.S.C. § 1915(d), now incorporated in 28 U.S.C. § 1915(e), as amended).

[4] *Davis v. Scott*, 157 F.3d 1003, 1005 (5th Cir. 1998); *Reeves v. Collins*, 27 F.3d 174, 176 (5th Cir. 1994).

[5] *Macias v. Raul A. (Unknown), Badge No. 153*, 23 F.3d 94, 97 (5th Cir. 1994) (quoting *Neitzke v. Williams*, 490 U.S. 319, 327 (1989)).

[6] *Spears*, 766 F.2d at 180.

[7] *Davis*, 157 F.3d at 1005.

[8] *Wilson v. Barrientos*, 926 F.2d 480, 481 (5th Cir. 1991); *Adams v. Hansen*, 906 F.2d 192, 194 (5th Cir. 1990).

[9] *Spears*, 766 F.2d at 182.

[10] *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997) (citing *Cay v. Estelle*, 789 F.2d 318, 326–27 (5th Cir. 1986), *overruled on other grounds by Denton v. Hernandez*, 504 U.S. 25 (1992)).

[11] *Id.* (citing *Wilson*, 926 F.2d at 482–83; *Williams v. Luna*, 909 F.2d 121, 124 (5th Cir. 1990)).

sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference.'"[12]

After a *Spears* hearing and its concurrent opportunity to amend, a complaint may be dismissed for failure to state a claim or as legally frivolous if it lacks an arguable basis in law[13] or "as factually frivolous only if the facts alleged are 'clearly baseless,' . . . [or] when the facts alleged rise to the level of the irrational or wholly incredible."[14]

A complaint fails to state a claim on which relief may be granted when the plaintiff does not "plead enough facts to state a claim to relief that is plausible on its face. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."[15] "'A complaint lacks an arguable basis in law if it is based on an indisputably meritless legal theory, such as if the complaint alleges the violation of a legal interest which clearly does not exist.'"[16] "When a complaint raises an arguable question of law which the district court ultimately finds is correctly resolved against the plaintiff, dismissal under Rule 12(b)(6) is appropriate; however, dismissal under the section 1915(d) standard is not."[17] A prisoner's *in forma pauperis* complaint that fails to state a claim may be dismissed *sua sponte* at any time. 28 U.S.C. § 1915(e)(2); 42 U.S.C. § 1997e(c)(1).

In this case, I recommend that Plaintiff's excessive force claims, as expanded by his *Spears* testimony explaining the factual basis of his claims, should not be dismissed at this time. I further recommend that Plaintiff's claims against Deputy Dennis for charging Plaintiff with criminal

---

[12] *Gobert v. Caldwell*, 463 F.3d 339, 347 n.24 (5th Cir. 2006) (quoting *Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995)) (internal citations omitted).
[13] *Jackson v. Vannoy*, 49 F.3d 175, 176–77 (5th Cir. 1995); *Moore v. Mabus*, 976 F.2d 268, 269 (5th Cir. 1992)
[14] *Moore*, 976 F.2d at 270.
[15] *In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir. 2007) (citation, footnote, and quotation omitted).
[16] *Davis*, 157 F.3d at 1005 (quoting *McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir. 1997)).
[17] *Moore*, 976 F.2d at 269.

offenses without *Miranda* warning, intake procedures, or Magistrate hearing be stayed pending resolution of his underlying state court criminal proceeding.  I further recommend that Plaintiff's remaining claims should be dismissed under 28 U.S.C. § 1915(e)(2) and/or 42 U.S.C. § 1997e(c)(1), as Plaintiff fails to state a cognizable § 1983 claim of violation of constitutional rights, even under the broadest reading of his claims.[18]  I further recommend that Plaintiff Motion for Preliminary Injunction be dismissed as moot based on his transfer out of JPCC.

## III.    <u>LAW AND ANALYSIS</u>

Section 1983 creates a damages remedy for the violation of federal constitutional or statutory rights under color of state law:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any ... person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured.[19]

"The purpose of § 1983 is to deter state actors from using their badge of authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails."[20]  Because § 1983 merely provides a remedy for designated rights, rather than creating any substantive rights, "an underlying constitutional or statutory violation is a predicate to liability."[21] To establish § 1983 liability, a plaintiff must allege:

(1) deprivation of a right secured by the U.S. Constitution or federal law;

(2) that occurred under color of state law; and

(3) was caused by a state actor.[22]

---

[18] The court must "liberally construe briefs of *pro se* litigants and apply less stringent standards to parties proceeding *pro se* than to parties represented by counsel," *Smith v. Lonestar Constr., Inc.*, 452 F. App'x 475, 476 (5th Cir. 2011), *cert. denied*, 565 U.S. 1263 (2012) (quotation omitted); *Moore v. McDonald*, 30 F.3d 616, 620 (5th Cir. 1994).
[19] 42 U.S.C. § 1983.
[20] *Wyatt v. Cole*, 504 U.S. 158, 161 (1992).
[21] *Harrington v. Harris*, 118 F.3d 359, 365 (5th Cir. 1997) (citation omitted).
[22] *Victoria W. v. Larpenter*, 369 F.3d 475, 482 (5th Cir. 2004) (citation omitted).

A.  **Claims for Injunctive Relief/Motion for Preliminary Injunction**

In his complaint, Plaintiff seeks a federal consent decree against Jefferson Parish Sheriff Lopinto (who is not named as a defendant in this matter), installation of security cameras at JPCC, an investigation into the policies and procedures of the Jefferson Parish Sheriff's Office and JPCC, and transfer to federal custody for his protection.  ECF No. 1-1, at 6–8.  Plaintiff also filed a Motion for Preliminary Injunction (ECF No. 13) seeking a court order for JPCC officials "to cease any mental emotional injury and/or physical abuse" based on Plaintiff's complaints about deprivation of his constitutional rights.  *Id.* at 3.  He further seeks to be transferred from JPCC to "an adjoining parish jail, federal custody, or [that this court] initiate a full and complete investigation" into his alleged constitutional deprivations at JPCC.  *Id.*

Since Plaintiff filed this lawsuit on November 27, 2019, he was transferred to the Raymond Laborde Correctional Center, where he is currently incarcerated.  ECF No. 19.  "A prisoner's transfer to another facility renders his claims for declaratory and injunctive relief moot."[23]  Even if Plaintiff asked for an injunction based on the possibility that he might someday be housed again at JPCC, he does not articulate any particular facts in his written submissions or *Spears* testimony that suggest there is a realistic likelihood of that happening.  The mere possibility that Plaintiff might someday be transferred back to JPCC "is too speculative to warrant relief."[24]  Thus, Plaintiff's Motion for Preliminary Injunction (ECF No. 13) and his claims for injunctive relief in his complaint should be dismissed as moot.

---

[23] *Omran v. Prator*, 2015 WL 9647662, at *2 (W.D. La. July 10, 2015), *report and recommendation adopted*, 2016 WL 75088 (W.D. La. Jan. 6, 2016), *aff'd*, 674 F. App'x 353 (5th Cir. 2016) (citing *Herman v. Holiday*, 238 F.3d 660, 665 (5th Cir. 2001) (claims for injunctive and declaratory relief based on exposure to asbestos were mooted by transfer to another prison)) (internal quotations omitted); *see also Cooper v. Sheriff, Lubbock County*, 929 F.2d 1078, 1084 (5th Cir. 1991) (claims for injunctive relief based on denial of food at prior jail were moot upon inmate's transfer to different prison).

[24] *Herman*, 238 F.3d at 665.

B. <u>**First Amendment Free Exercise Claims**</u>

Plaintiff alleges that Deputy Chief Monfra, Deputy Bordelon, and Chaplin Kathy violated his First Amendment right to practice his Muslim faith by denying his request for prayer beads, prayer caps, and prayer rugs.  Broadly construed, Plaintiff further alleges that Detective Rivers, and Deputies Bordelon and Banner violated his religious rights by temporarily revoking his privilege to attend daily church services while in administrative segregation following his disciplinary hearing on September 16, 2019.

The Free Exercise Clause of the First Amendment, as applied to the states through the Fourteenth Amendment, prohibits governmental conduct which unreasonably impinges upon the free exercise of an inmate's religious beliefs.  While inmates retain their First Amendment religious rights notwithstanding their incarcerated status, the exercise of these rights is subject to reasonable restrictions and limitations of many privileges and rights necessitated by penological goals—including deterrence of crime, rehabilitation of prisoners, and institutional security.[25]

A prison action or regulation that impinges upon an inmate's First Amendment rights is valid if it is reasonably related to legitimate penological interests.[26]  In evaluating the reasonableness of a prison policy, a court should consider (1) the existence of a valid, "rational connection" between the state action and the legitimate governmental interest set out to justify it; (2) the availability of alternative means to exercise that right; (3) the impact an accommodation will have on guards, other inmates, and the allocation of prison resources, and (4) the absence of alternatives that fully accommodate the prisoner's right at *de minimis* cost to valid penological interests.[27]  In analyzing the availability to inmates of "alternative means" of exercising their

---

[25] *DeMarco v. Davis*, 914 F.3d 383, 388–89 (5th Cir. 2019) (citing *O'Lone v. Shabazz*, 482 U.S. 342, 349 (1987)); *see also Baranowski v. Hart*, 486 F.3d 112, 120 (5th Cir. 2007) (citing *Turner v. Safley*, 482 U.S. 78, 89 (1987)).
[26] *Turner*, 482 U.S. at 89.
[27] *Id.* at 89–91.

religion, "[t]he pertinent question is not whether the inmates have been denied specific religious accommodations, but whether, more broadly, the prison affords the inmates opportunities to exercise their faith."[28] "A court must determine whether the government objective underlying the regulation at issue is legitimate and neutral, and that the regulations are rationally related to that objective."[29] Due regard also must be given to the decisions of prison officials, because "'prison administrators . . ., and not the courts, [are] to make the difficult judgments concerning institutional operations.'"[30]

The Fifth Circuit has held that a prison's "refusal to provide the demanded religious articles is well within the latitude in the administration of prison affairs which prison officials must be accorded."[31] Considering the *Turner* factors, Plaintiff fails to state a claim for violation of his First Amendment Free Exercise rights based on the denial of prayer caps, beads, and rugs. Plaintiff's written submissions, as supported by his *Spears* testimony, illustrate a "rational connection" between the JPCC regulation (banning these articles both in-house and from third-party shipping vendors) and a legitimate governmental interest set out to justify it (maintaining security, safety, and cleanliness in the prison facility for the benefit of staff and inmates). JPCC officials provided Plaintiff with multiple alternative means to fully accommodate his right to practice his Muslim faith at *de minimis* cost to the prison: participation in daily religious services while not in administrative segregation, reading his own Quran, and engaging in solitary prayer. In addition, Plaintiff conceded that prayer caps, beads, and rugs were not required for him to practice his Muslim faith. Accommodating Plaintiff's request would impact allocation of prison resources and

---

[28] *Adkins v. Kaspar*, 393 F.3d 559, 564 (5th Cir. 2004).
[29] *Freeman v. TDCJ*, 369 F.3d 854, 860 (5th Cir. 2004) (internal quotation marks and citation omitted).
[30] *Turner*, 482 U.S. at 89 (omission and alteration in original) (citing *Jones v. N.C. Prisoners' Labor Union*, 433 U.S. 119, 128 (1977)).
[31] *Frank v. Terrell*, 858 F.2d 1090, 1091 (5th Cir. 1988) (quotation marks omitted); *accord Mack v. Reynolds*, 2000 WL 1808277, at *3 (N.D. Tex. Dec. 11, 2000) ("There is no legal or constitutional requirement that inmates be provided with religious materials at government expense.").

staff insofar as JPCC would need to acquire and store these articles in-house or receive and process deliveries from an unfamiliar, third-party source. This accommodation would also open up JPCC to special requests from other inmates for other desired religious items.

Plaintiff further fails to state a First Amendment claim based on loss of his privilege to attend daily religious services while in administrative segregation. There is a "rational connection" between the JPCC regulation (temporary revocation of inmate privileges during administrative segregation) and a legitimate governmental interest set out to justify it (deterring future inmate disciplinary violations). As stated above, JPCC officials gave Plaintiff alternative means to practice his Muslim faith at *de minimis* cost to the prison. Accommodating Plaintiff's request to attend religious services while in administrative segregation would destroy the deterrent effect of lockdown and would also open up JPCC to other inmate requests for restoration of privileges during administrative segregation.

For the foregoing reasons, Plaintiff fails to allege a First Amendment claim for violation of his Free Exercise rights under the Supreme Court precedent cited above, and his claims should be dismissed as frivolous and/or for failure to state a claim upon which relief can be granted.[32]

C. <u>Supervisory Liability of Deputy Chief Monfra for Non-Religious Claims</u>

Plaintiff testified at the *Spears* hearing that Deputy Chief Monfra was not personally involved in any of the alleged acts or omissions upon which his claims are based, other than denying Plaintiff access to religious articles, addressed above in Section III.B. Aside from the First Amendment claims, Plaintiff confirmed during the *Spears* hearing that he named Chief Deputy Monfra as a Defendant based solely upon her official responsibilities over JPCC staff. Broadly construed, Plaintiff's complaint and *Spears* testimony allege that Deputy Chief Monfra is

---

[32] 28 U.S.C. § 1915(e)(2); 42 U.S.C. § 1997e(c)(1).

vicariously liable for Plaintiff's medical care, conditions of confinement, disciplinary proceedings, cell searches, and her subordinates' use of force force and failure to intervene during physical altercations.

To hold Deputy Chief Monfra personally liable, Plaintiff must establish either that she was "personally involved in the acts causing the deprivation of his constitutional rights or that a causal connection exists between an act of [Monfra] . . . and the alleged constitutional violation."[33]  As stated above, Plaintiff has failed to establish that Deputy Chief Monfra personally was involved in any acts causing the deprivation of his constitutional rights.  He further fails to allege that a causal connection exists between any act Deputy Chief Monfra and the alleged constitutional violations.

"There is no respondeat superior liability under section 1983."[34]  Deputy Chief Monfra therefore cannot be held liable under § 1983 pursuant to a theory of respondeat superior simply because the persons allegedly responsible for Plaintiff's injuries were in her employ or under her supervision.[35]  A supervisory official may be held liable for her subordinates' actions only if the official implemented an unconstitutional policy that causally resulted in plaintiff's injury.[36]  No such unconstitutional custom, usage or policy for which Deputy Chief Monfra can be held constitutionally liable has been alleged by Plaintiff, and thus, he fails to state a claim for relief against her under § 1983.[37]

---

[33] *Douthit v. Jones*, 641 F.2d 345, 346 (5th Cir. 1981); *accord Cox v. Irby*, 281 F. App'x 390, 391 (5th Cir. 2008); *Kohler v. Englade*, 470 F.3d 1104, 1114–15 (5th Cir. 2006).
[34] *Eason v. Thaler*, 73 F.3d 1322, 1327 (5th Cir. 1996); *accord Field v. Corr. Corp. of Am. Inc.*, 364 F. App'x 927, 929 (5th Cir. 2010); *Cox*, 281 F. App'x at 391; *Kohler*, 470 F.3d at 1115.
[35] *Sanders v. English*, 950 F.2d 1152, 1160 (5th Cir. 1992); *Baskin v. Parker*, 602 F.2d 1205, 1208 (5th Cir. 1979); *Barksdale v. King*, 699 F.2d 744, 746 (5th Cir. 1983).
[36] *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691–95 (1978); *Thompson v. Johnson*, 348 F. App'x 919, 921 (5th Cir. 2009) (citing *Mouille v. City of Live Oak*, 977 F.2d 924, 929 (5th Cir. 1992)); *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 435 (5th Cir. 2008).
[37] *Monell*, 436 U.S. at 691–95; *Thompson*, 348 F. App'x at 921–22; *Mouille*, 977 F.2d at 929.

Plaintiff has failed to establish any of the foregoing essential elements of a supervisory claim under § 1983 or to allege that Deputy Chief Monfra was personally involved in any acts causing the alleged deprivation of his constitutional rights. Accordingly, Plaintiff's claims against Deputy Chief Monfra should be dismissed as frivolous and/or for failure to state a claim upon which relief can be granted.[38]

### D. No Right to Privacy from Prison Cell Searches

To the extent Plaintiff alleges that Defendants violated his constitutional privacy rights during the cell searches referenced in his written submissions and *Spears* testimony, prisoners do not have an expectation of privacy in their cells, which prison officials may search at any time.[39] The Fifth Circuit has described the *Hudson* holding as a "per se" and "bright line rule" that the Fourth Amendment does not apply to jail cells.[40] Post-deprivation proceedings such as prison grievance procedures are adequate to satisfy due process requirements with respect to confiscation of property pursuant to prison regulations, though Plaintiff has not alleged that any property was confiscated during the cell searches.[41]

Thus, Plaintiff fails to allege a Fourth Amendment claim under the Supreme Court precedent cited above, and his claims on that basis should be dismissed as frivolous and/or for failure to state a claim upon which relief can be granted.[42]

---

[38] 28 U.S.C. § 1915(e)(2); 42 U.S.C. § 1997e(c)(1).

[39] *Hudson v. Palmer*, 468 U.S. 517, 528–29 (1984).

[40] *United States v. Ward*, 561 F.3d 414, 417 & 419 (5th Cir. 2009) (finding that under *Hudson* a prison escapee could not invoke the Fourth Amendment to suppress evidence obtained from a warrantless search of his motel room and bag); *see also United States v. Guerrero*, 2011 WL 13114250, at *2 (W.D. Tex. Jun. 27, 2011) (recognizing *Hudson* as establishing a "bright line rule" that the Fourth Amendment does not apply to prison cells); *United States v. Melancon*, 2010 WL 324007, at *8–9 (E.D. La. Jan. 21, 2010) (expanding *Hudson* to find that a prisoner did not have an expectation of privacy in the prison visitation room); *United States v. Owens*, 2009 WL 3379110, at *2 (W.D. La. Oct. 19, 2009) (recognizing that *Hudson* established "as a per se rule [that] a prisoner cannot invoke the Fourth Amendment" concerning a search of his prison cell).

[41] *McQueen v. Vance*, 68 F.3d 471, 1995 WL 581861, at *1 (5th Cir. 1995) (citation omitted); *Allen v. Thomas*, 2005 WL 2076033, at *9 (S.D. Tex. Aug. 26, 2005).

[42] 28 U.S.C. § 1915(e)(2); 42 U.S.C. § 1997e(c)(1).

### E.  Disciplinary Isolation Following September 16, 2019 Disciplinary Proceeding

Plaintiff claims that his due process rights were violated by Detective Rivers and Deputies Banner and Bordelon during his September 16, 2019 disciplinary hearing based on "arbitrary, capricious and malicious findings" of the disciplinary board, failure to videotape his hearing, lack of assistance of counsel, inability to call witnesses, and use of a single-person disciplinary board. Plaintiff's written submissions indicate that he received a disciplinary violation from Deputy Banks following a cell search on an unspecified date, which was dismissed after a disciplinary hearing before Detective Rivers on September 16, 2019.  However, Detective Rivers sentenced Plaintiff to administrative segregation following the disciplinary hearing based on his failure to acknowledge Deputy Banks's authority to search his cell.  Plaintiff did not lose any good time credits, however, he temporarily lost privileges to attend daily religious services and contact family members while in administrative segregation.

In *Sandin v. Connor*, 515 U.S. 472, 481–83 (1995), the United States Supreme Court held that analysis of a prisoner's due process claim relating to his placement in lockdown or other disciplinary punishment begins with determining whether a constitutionally protected liberty interest exists. "Liberty interests protected by the Fourteenth Amendment may arise from two sources–the Due Process Clause itself and the laws of the States."[43]  In *Sandin*, the Supreme Court recognized that, although the States may create liberty interests, "these interests will generally be limited to freedom from restraint which . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." [44]  Thus, in *Sandin*, when a prisoner was placed in disciplinary segregation for 30 days and the placement did not inevitably affect the duration of his sentence, the Court held that due process does not require that a prisoner be afforded the

---

[43] *Hewitt v. Helms*, 459 U.S. 460, 466 (1983).
[44] *Sandin*, 515 U.S. at 484 (citations omitted).

20

procedural mechanisms previously prescribed in *Wolff v. McDonnell*, 418 U.S. 539 (1974), and *Hewitt*, 459 U.S. at 460.

"[T]he Due Process Clause does not protect every change in conditions of confinement which has a substantial adverse effect upon a prisoner."[45] "Prisoners held in lawful confinement have their liberty curtailed by definition, so the procedural protections to which they are entitled are more limited than in cases where the right at stake is the right to be free from confinement at all."[46] The Fifth Circuit in *Madison* held that a prisoner's 30-day commissary and cell restrictions imposed as punishment for disciplinary violations were "merely changes in the conditions of his confinement and do not implicate due process concerns."[47] In *Hernandez* and *Madison*, the Fifth Circuit held that such restrictions do not represent the type of atypical, significant deprivation in which a state might create a liberty interest.[48] Examples of prison hardships that would qualify as so atypical and significant as to implicate due process considerations include unwanted administration of antipsychotic drugs, involuntary commitment to a mental hospital, or extension of the prisoner's sentence for his underlying criminal conviction.[49]

In the instant case, Harris's testimony and his written submissions establish that the duration of his prison sentence was unaffected by his placement in administrative segregation, and the only action taken against him following his disciplinary hearing was isolation from the general prison population and temporary restriction of privileges. None of these actions constitute such an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison

---

[45] *Madison v. Parker*, 104 F.3d 765, 767 (5th Cir. 1997).
[46] *Wilkinson v. Austin*, 545 U.S. 209, 225 (2005) (citations omitted).
[47] *Madison*, 104 F.3d at 768; *accord Hernandez v. Velasquez*, 522 F.3d 556, 563 (5th Cir. 2008); *Dixon v. Hastings*, 117 F. App'x 371, 2005 WL 17382, at *1 (5th Cir. 2005); *Malchi v. Thaler*, 211 F.3d 953, 957–58 (5th Cir. 2000).
[48] *Hernandez*, 522 F.3d at 563; *Madison*, 104 F.3d at 768.
[49] *Sandin*, 515 U.S. at 484.

life" where the particular forms of process described in *Wolff* were required or that any due process violation occurred.[50]

Even if some process might be required for Plaintiff's disciplinary penalties, it is clear from Plaintiff's written submissions that he received a disciplinary hearing before a JPCC disciplinary board member. Courts must accord great deference to prison officials' administrative decisions and should not interfere with legitimate prison administration, including the substantial interest in maintaining prison order and discipline, in the absence of a constitutional violation.[51] Section 1983 claims are not bases for an inmate's appeal of the fact-findings of a prison disciplinary board. Such claims may proceed only where a showing of a constitutional violation has adequately been asserted. No such violation has been stated in this case.

Thus, Harris's complaint about his punishment for his disciplinary violation does not rise to the level of a constitutional violation. No claim of violation of due process rights cognizable under § 1983 can be stated, and his claim should be dismissed as frivolous and/or for failure to state a claim upon which relief can be granted.[52]

## F. <u>Retaliation Claim Against Deputy Dennis</u>

Plaintiff's written submissions allege that Deputy Dennis was involved in Plaintiff's "unlawful" and "fraudulent" 2016 arrest and that Deputy Dennis's use of force against Plaintiff on October 19, 2019, was in retaliation for the 2016 arrest. Broadly construed, Plaintiff may also be

---

[50] *Id.*; *Madison*, 104 F.3d at 768; *see Johnson v. Livingston*, 360 F. App'x 531, 532 (5th Cir. 2010) (citing *Malchi v. Thaler*, 211 F.3d 953, 958 (5th Cir. 2000)) ("Loss of privileges and cell restriction do not implicate due process concerns."); *Hernandez*, 522 F.3d at 563 (distinguishing the "extreme conditions" described in *Wilkinson* and holding that non-disciplinary "confinement to a shared cell for twelve months with permission to leave only for showers, medical appointments and family visits . . . is by no means an atypical prison experience"); *Dixon*, 117 F. App'x at 372 ("loss of commissary privileges, cell restriction, placement in administrative segregation, and extended work schedule were not atypical punishments requiring due process protections"); *Payne v. Dretke*, 80 F. App'x 314, 314 (5th Cir. 2003) ("commissary and recreation restrictions [as disciplinary punishment] . . . do not implicate a liberty interest under the Due Process Clause").
[51] *Bell*, 441 U.S. at 547–48; *Smith v. Bingham*, 914 F.2d 740, 742 (5th Cir. 1990).
[52] 28 U.S.C. § 1915(e)(2); 42 U.S.C. § 1997e(c)(1).

alleging that Deputy Dennis retaliated against Plaintiff for filing written grievances at JPCC and/or filing the present civil rights lawsuit.  Plaintiff testified generally that Deputy Dennis instructed unnamed JPCC officials to retaliate against Plaintiff to violate his constitutional rights.

Prison officials may not retaliate against a prisoner for exercising his First Amendment right of access to the courts or to complain through proper channels about alleged misconduct by prison officials.[53]   The law on retaliation claims in the Fifth Circuit is based on the following general principles:

> The elements of a retaliation claim are the invocation of a specific constitutional right, the defendants' intent to retaliate against the plaintiff for his or her exercise of that right, a retaliatory adverse act, and causation, *i.e.*, but for the retaliatory motive the complained of incident . . . would not have occurred. With respect to the last element, we [have] emphasized that an action motivated by retaliation for the exercise of a constitutionally protected right is actionable even if the act, when taken for a different reason, may have been legitimate.[54]

In *Woods*, the Fifth Circuit, applying the general First Amendment principles addressed above, affirmed the district court's denial of defendants' motion for summary judgment. Defendants had sought dismissal of a prisoner's claim based on allegedly false disciplinary charges by defendants in alleged retaliation for plaintiff's letters of complaint to a federal judge and the prison warden. The Fifth Circuit agreed with the district court that the inmate's retaliation claim should be permitted to proceed, but in doing so it expressed the following caution: "The prospect of endless claims of retaliation on the part of inmates would disrupt prison officials in the discharge of their most basic duties. Claims of retaliation must therefore be regarded with skepticism, lest

---

[53] *Walker v. Savers*, 2016 WL 4151212, at *5 (5th Cir. Aug. 4, 2016) (citing M*orris v. Powell*, 449 F.3d 682, 684 (5th Cir. 2006)); *Woods v. Smith*, 60 F.3d 1161, 1164 (5th Cir. 1995).

[54] *Clarke v. Stalder*, 121 F.3d 222, 231 (5th Cir. 1997), *vacated in part & reinstated in relevant part*, 154 F.3d 186 (5th Cir. 1998) (citing *Bounds v. Smith*, 430 U.S. 817 (1977); *Johnson v. Rodriguez*, 110 F.3d 299, 310 (5th Cir. 1997); *Woods*, 60 F.3d at 1164–66) (quotations and additional citations omitted); *accord Walker*, 2016 WL 4151212, at *5.

federal courts embroil themselves in every disciplinary act that occurs in state penal institutions."[55]

The Fifth Circuit warned that "trial courts must carefully scrutinize these claims."[56]

> To state a claim of retaliation *an inmate must allege the violation of a specific constitutional right* and be prepared to establish that *but for* the retaliatory motive the complained of incident . . . would not have occurred. This places a significant burden on the inmate . . . . The inmate must produce *direct evidence of motivation* or, the more probable scenario, "allege a chronology of events from which retaliation may plausibly be inferred."[57]

A year after *Woods*, the Supreme Court reexamined the scope of prisoners' First Amendment right of access to the courts in *Lewis v. Casey*, 518 U.S. 343 (1996). To state a claim that his constitutional right of access to the courts was violated, a prisoner must demonstrate that his position as a litigant was actually prejudiced.[58]  In *Lewis*, the Supreme Court made clear that an inmate must establish actual injury to state a claim for denial of his right of access to the courts.[59]

In *Morris*, the Fifth Circuit addressed "[w]hether an allegation of *de minimis* retaliatory acts can support a retaliation claim" under the First Amendment.[60] The court stated:

> The question, however, is not whether the violation of [plaintiff's] constitutional rights was *de minimis*, but whether any violation occurred at all. To establish a constitutional violation, an inmate must show that he suffered a qualifying adverse retaliatory act. If the retaliation alleged by [plaintiff] does not pass this bar, he has suffered no constitutional injury.[61]

The Fifth Circuit then held:

> The purpose of allowing inmate retaliation claims under § 1983 is to ensure that prisoners are not unduly discouraged from exercising constitutional rights. Some acts, though maybe motivated by retaliatory intent, are so *de minimis* that they would not deter the ordinary person from further exercise of his rights. Such acts

---

[55] *Woods*, 60 F.3d at 1166 (citation and quotation omitted).

[56] *Id.*

[57] *Id.* (citations omitted) (emphasis added); *accord Walker*, 2016 WL 4151212, at *5.

[58] *Lewis*, 518 U.S. at 356; *Every v. Jindal*, 413 F. App'x 725, 727 (5th Cir. 2011) (citing *Lewis*, 518 U.S. at 349–50; *Jones v. Greninger*, 188 F.3d 322, 325 (5th Cir. 1999)); *Cochran v. Baldwin*, 196 F. App'x 256, 257–58 (5th Cir. 2006) (citing *Lewis*, 518 U.S. at 350–51); *Eason v. Thaler*, 73 F.3d 1322, 1328 (5th Cir. 1996).

[59] *Lewis*, 518 U.S. at 349–50.

[60] *Morris*, 449 F.3d at 684.

[61] *Id.*

do not rise to the level of constitutional violations and cannot form the basis of a
§ 1983 claim

. . . . . Retaliation against a prisoner is actionable only if it is capable of
deterring a person of ordinary firmness from further exercising his constitutional
rights. . . .

With this standard in mind, we turn to the specific retaliation alleged by
[plaintiff] to determine whether the actions of the [prison] officials would have
deterred a person of ordinary firmness from exercising his First Amendment right
to file grievances against prison officials.[62]

The Fifth Circuit's reasoning and rulings in *Morris* accord with the Supreme Court's

holding in *Lewis* that a prisoner who brings a retaliation claim under the First Amendment must

allege actual injury in order to assert a claim. Furthermore, the alleged retaliatory acts must be

more than *de minimis*, which means they must be capable of deterring a person of ordinary

firmness from further exercising his constitutional rights. The existence of a "[legitimate] prison

disciplinary report is highly probative, if not dispositive, of whether a defendant acts with a

retaliatory animus."[63]

Thus, the law in the Fifth Circuit

is well established that prison officials may not retaliate against an inmate who
exercises his right of access to court. Officials likewise may not retaliate against an
inmate for using the grievance system. A plaintiff must allege facts showing that
the defendant possessed a retaliatory motive. The inmate *must show more than his
personal belief that he was the victim of retaliation. Mere conclusory allegations
of retaliation are not enough*.[64]

In this case, Plaintiff has not alleged anything more than his personal belief that Deputy

Dennis possessed a retaliatory motive based on Plaintiff's use of the prison grievance procedure

and/or the filing of the present lawsuit. Moreover, Plaintiff does not allege that any such motive

---

[62] *Id.* at 686 (citing *Crawford-El v. Britton*, 523 U.S. 574, 588 n.10 (1998)).

[63] *Rankin v. Pearson*, 2013 WL 1305517, at *6 (S.D. Miss. Mar. 26, 2013), *aff'd*, 612 F. App'x 204 (5th Cir. 2015)
(citing *Woods*, 60 F.3d at 1166); *accord Reese v. Skinner*, 322 F. App'x 381, 383–84 (5th Cir. 2009).

[64] *Decker v. McDonald*, 2010 WL 1424322, at *15 (E.D. Tex. Jan. 11, 2010), *report & recommendation adopted*,
2010 WL 1424292 (E.D. Tex. Apr. 7, 2010) (citing *Morris*, 449 F.3d at 687; *Jones v. Greninger*, 188 F.3d 322, 324–
25 (5th Cir. 1999); *Johnson v. Rodriguez*, 110 F.3d 299, 310 (5th Cir. 1997); *Moody v. Baker*, 857 F.2d 256, 258 (5th
Cir. 1988); *Whittington v. Lynaugh*, 842 F.2d 818, 820 (5th Cir. 1988)) (additional citations omitted) (emphasis
added); *accord Walker*, 2016 WL 4151212, at *5.

was the "but-for" cause of any adverse act he suffered at JPCC.  Plaintiff further does not allege that his position as a litigant was actually prejudiced, as required to state a claim that his constitutional right of access to the courts was violated.  Plaintiff vaguely suggests that Deputy Dennis's use of force against him on October 19th was an adverse act in retaliation for Deputy Dennis's role in Plaintiff's "fraudulent" and "unlawful" arrest in 2016.  However, Plaintiff's written submissions do not allege that Plaintiff exercised a specific constitutional right concerning the 2016 arrest on which Deputy Dennis based his retaliatory motive.  Without alleging a specific constitutional right, Plaintiff fails to state a § 1983 retaliation claim under the Fifth Circuit precedent cited above.

For the foregoing reasons, Plaintiff's retaliation claims against Deputy Dennis are legally frivolous and fails to state claims upon which relief can be granted.[65]

### G.  Claim Against Deputy Dennis for Charging Plaintiff with Criminal Offenses Without _Miranda_ Warning, Intake Procedures, or Magistrate Hearing

Plaintiff's written submissions appear to allege that Deputy Dennis took him to the prison booking department on October 19, 2019, to charge him with three criminal offenses without administering a _Miranda_ warning and typical intake procedures, and without receiving a magistrate hearing.

Regardless of whether Plaintiff seeks injunctive relief or damages under § 1983, Plaintiff's claim must be stayed at this time under _Heck v. Humphrey_, 512 U.S. 477 (1994).  In _Heck_, the Supreme Court held that a civil action for alleged civil rights violations that attacks the validity of state criminal charges or confinement, which have not been reversed, expunged, invalidated, or called into question by a federal court's issuance of a writ of habeas corpus, is not cognizable under § 1983.

---

[65] 28 U.S.C. § 1915(e)(2); 42 U.S.C. § 1997e(c)(1).

> [T]o recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983. Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.[66]

Although *Heck* involved a civil action for monetary damages, the Fifth Circuit has also applied *Heck* to claims seeking injunctive relief.[67]

Plaintiff's conviction was reversed on December 8, 2019 and the trial judge ordered that Plaintiff be given a new trial. As such, what Plaintiff seeks to assert is a claim that would impugn a potential future conviction. Such a claim cannot be brought until that pending matter is resolved, and if convicted, that conviction is set aside.[68] Plaintiff's claims that he did not receive a *Miranda* warning, proper intake procedures, and a magistrate hearing would necessarily imply the invalidity of the criminal charges, and ultimately conviction, if he is convicted on any or all of the three charges.[69] However, the charges against Plaintiff remain pending. Thus, Plaintiff's claims are premature and must be stayed until such time that he is acquitted or, if he is convicted, his criminal conviction is set aside. As the Fifth Circuit has noted, a stay of Plaintiff's claims is proper when intertwined and related charges are still pending and the civil rights claim attacks the legality of the arrest, prosecution, or detention, until conclusion of the underlying state prosecution.[70]

---

[66] *Heck*, 512 U.S. at 486–87 (emphasis in original) (footnote omitted).
[67] *Clarke v. Stalder*, 154 F.3d 186, 189 (5th Cir. 1998) (citing *Edwards v. Balisok*, 520 U.S. 641 (1997)).
[68] *See Wallace v. Kato*, 549 U.S. 384, 393 (2007).
[69] *Heck*, 512 U.S. at 479.
[70] *See Hopkins v. Ogg*, 783 F. App'x 350, 355 & n.20 (5th Cir. 2019) (citing *Mackey v. Dickson*, 47 F.3d 744, 746 (5th Cir. 1995)).

H. **Excessive Force Claims Against Deputies Dennis and Knox, Lieutenant Berrian, Sergeant Glass, and Non-Defendant Deputy Johnson**

Harris alleges three incidents of excessive force by JPCC officials: (1) on October 19, 2019, Deputy Dennis tased him three times, tackled him, and ran his body into walls and doorframes while Plaintiff was initially unrestrained but later handcuffed; (2) on October 31, 2019, Lieutenant Berrian, Deputy Knox, and/or non-defendant Deputy Johnson struck Plaintiff's face with handcuffs, broke his nose, fractured his jaw, shoved his injured shoulder, placed him in a chokehold, straddled his back, and struck him with bare hands and/or baton, all while Plaintiff was handcuffed; and (3) on October 31, 2019, Sergeant Glass tased him in the JPCC infirmary, with the record unclear as to whether Plaintiff was handcuffed or restrained at the time.

Plaintiff was a convicted prisoner at the time of the three incidents about which he complains. The United States Supreme Court has "held that 'the use of excessive physical force against a prisoner may constitute cruel and unusual punishment [even] when the inmate does not suffer serious injury.'"[71] The Supreme Court in *Wilkins* confirmed that the standards it established in *Hudson* remain the law.

> The "core judicial inquiry," we held [in *Hudson*], was not whether a certain quantum of injury was sustained, but rather "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." 503 U.S. at 7, 112 S. Ct. 995; *see also Whitley v. Albers*, 475 U.S. 312, 319–321 . . . (1986). "When prison officials maliciously and sadistically use force to cause harm," the Court recognized, "contemporary standards of decency always are violated . . . whether or not significant injury is evident. . . ." *Hudson*, 503 U.S. at 9 . . . .
>
> . . . . As we stated in *Hudson*, not "every malevolent touch by a prison guard gives rise to a federal cause of action." 503 U.S. at 9 . . . . "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Ibid.* (some internal quotation marks omitted). An inmate who complains of a "push or shove"

---

[71] *Wilkins v. Gaddy*, 559 U.S. 34, 34 (2010) (quoting *Hudson v. McMillian*, 503 U.S. 1, 4 (1992)).

that causes no discernible injury almost certainly fails to state a valid excessive force claim. *Ibid.* (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).[72]

The Supreme Court in *Wilkins* "left open the possibility of dismissal where the *injury conclusively shows* that the force applied was not unconstitutional."[73]  *Wilkins* confirmed that *Hudson* remains the touchstone for evaluating claims under the Eighth Amendment. Thus, the Fifth Circuit's prior cases that relied on *Hudson* continue to provide binding legal standards for this court.

Under the Eighth Amendment and §1983, the appropriate inquiry is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."[74]  Plaintiff need not show a significant injury to establish a constitutional violation; however, the extent of injury may be considered in determining whether the force used was malicious, wanton or unnecessary.[75]  In addition, "[t]he Eighth Amendment's prohibition of cruel and unusual punishment excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'"[76]

The law thus

require[s] a plaintiff asserting an excessive force claim to have suffered at least some form of injury . . . . [W]e do not permit a cause of action for every contact between a citizen and a police officer. In just about every conceivable situation, some amount of force or contact would be too nominal to constitute a constitutional violation. When the force used is insufficient to satisfy the legal standard necessary for recovery, the amount of force is *de minimis* for constitutional purposes.[77]

---

[72] *Id.* at 37–38.
[73] *Williams v. Jackson*, 600 F.3d 1007, 1012 (8th Cir. 2010) (citing *Wilkins*, 130 S. Ct. at 1180) (emphasis added).
[74] *Hudson*, 503 U.S. at 6; *accord Petta v. Rivera*, 143 F.3d 895, 901 (5th Cir. 1998); *Flowers v. Phelps*, 956 F.2d 488, 491 (5th Cir. 1992).
[75] *Hudson*, 503 U.S. at 7; *Flowers*, 956 F.2d at 491.
[76] *Siglar v. Hightower*, 112 F.3d 191, 193 (5th Cir. 1997) (quoting *Hudson*, 503 U.S. at 9–10).
[77] *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999) (quotation omitted).

To determine whether injury caused by excessive force is more than *de minimis* for constitutional purposes, the context in which the force was used and all the surrounding circumstances must be examined.[78]

Fifth Circuit case law addressing the use of taser guns in the excessive force context supports an officer's use of a taser gun to subdue inmates and suspects in some situations. The Fifth Circuit has not expressly addressed the use of taser guns to subdue a convicted inmate's noncompliance with procedural orders.  Recently, in *Cadena v. Ray*, the Fifth Circuit held that an officer's use of a taser on a suspect who continued to resist arrest did not violate the plaintiff's Fourth Amendment rights because

> tasing is permissible "after [a suspect] *continuously fail[s] to comply and "resist[s] handcuffing*," particularly when it is not "the first method to gain . . . compliance." But we have also said that *tasing is inappropriate where either it is unclear that the plaintiff was resisting* or the plaintiff was not resisting at all. Here, four officers helped "take down" [plaintiff], and the video evidence clearly shows that he nonetheless continued to resist handcuffing. *Only after the Officers tried conventional methods* to subdue [plaintiff] did [an officer] intervene with the taser.
> In *Poole* [v. *City of Shreveport*], we also approved the use of a taser as a *response to escalating resistance*. Though the video does not clearly show when [the officer] fired the second taser round, it does show that immediately after the first taser shot [plaintiff] swiped at one of the arresting officers with his arm. [The officer] could have reasonably interpreted [plaintiff's] swipe as an escalation of resistance, justifying the second taser shot as a proportional response.[79]

In the Eighth Amendment context, other circuits have held that the use of a taser gun is *not* a *de minimis* application of force.  For example, in *Lewis v. Downey*, the Seventh Circuit held that an officer's use of a taser gun on a non-compliant inmate was not *de minimis*, and that a genuine issue of material fact precluded summary judgment.[80] The court reasoned that

---

[78] *Id.*

[79] 728 F. App'x 293, 297 & n. 20–22 (5th Cir. 2018) (citing *Poole v. City of Shreveport*, 691 F.3d 624 (5th Cir. 2012); *Pratt v. Harris Cty. Tex.*, 822 F.3d 174, 182 (5th Cir. 2016); *Darden v. City of Fort Worth*, 800 F.3d 722, 729–31 (5th Cir. 2018); *Pena v. Rio Grande City*, 879 F.3d 613, 619–20 (5th Cir. 2018)) (emphasis added).

[80] *Lewis v. Downey*, 581 F.3d 467, 475–78 (7th Cir. 2009).

pain, not injury, is the barometer by which we measure claims of excessive force, and one need not have personally endured a taser jolt to know the paint that must accompany it. Thus, we hold, as the first rung in the ladder of our analysis, that the use of a taser gun against a prisoner is more than a *de minimis* application of force.[81]

In the second rung of the court's analysis, the *Lewis* court considered the officer's state of mind when he discharged the taser and held that a genuine dispute of material fact existed.

In many circumstances–often when faced with aggression, disruption, or physical threat–compelling compliance with an order is a valid penological justification for use of a taser. But such justification does not necessarily exist every time an inmate is slow to comply with an order. What must be decided in each case, and the issue to which we next turn, is whether the facts surrounding the taser's deployment–as [plaintiff] portrays them–demonstrated actual malice or sadistic purpose on the part of the user.
. . .
The exact sequence of events leading to the taser's use in this case is strongly disputed . . . . [W]e find several facts troubling: the absence of any agitation or threat from [plaintiff]; the short passage of time between [the officer's] order and the taser shot; [the officer's] single, unrepeated order; and the dearth of warnings regarding the consequences of [plaintiff's] failure to comply.[82]

The Seventh Circuit included a survey of other circuits' opinions in which the use of a taser was upheld when the victims were "violent, aggressive, confrontational, unruly, or presented an immediate risk of danger to themselves or others.[83]  In addition, federal courts have often found that a prisoner stated a cognizable claim for excessive force when he alleges an officer's use of force after a prisoner has been restrained.[84]

---

[81] *Id.* at 475 (citing *Hudson*, 503 U.S. at 9) (additional citations omitted).

[82] *Id.* at 477–78 (citations omitted).

[83] *Id.* (citing *Jasper v. Thalacker*, 999 F.2d 353 (8th Cir. 1993) (Eighth Circuit condoned the use of taser to subdue the inmate who verbally threatened then lunged at a guard); *Caldwell v. Moore*, 968 F.2d 595 (6th Cir. 1992) (Sixth Circuit upheld use of stun gun against aggressive inmate who shouted at jailer and kicked cell door for seven hours, even after warnings that he would be forced to comply if he did not calm down); *Hunter v. Young*, 238 F. App'x 336, 339 (10th Cir. 2007) (Tenth Circuit upheld use of taser to force compliance with an order given moments after inmate's physical altercation with officers)).

[84] *See, e.g., Fennell v. Quintela*, 393 F. App'x 150, 152, 155 (5th Cir. 2010) (Prison officer allegedly grabbed handcuffed inmate's wrist and twisted them, resulting in injury, while his arms were confined in a cell's food tray slot.); *Watts v. Smart*, 328 F. App'x 291, 292, 293–94 (5th Cir. 2009) (evidence that defendants struck prisoner without provocation while he was in restraints created genuine fact issues whether force applied was excessive; *Morris v. Trevino*, 301 F. App'x 310, 313 (5th Cir. 2008) (Prisoner stated a claim for excessive force when he alleged that, despite his lack of provocation, officer twisted his arms into painful positions while his hands were handcuffed behind

At this early screening stage of the case, Plaintiff's assertions must be construed in his favor, without credibility determinations.  Applying this standard, I find, at least at this time, that Harris's written submissions, including the signed statements of his fellow inmates who witnessed the October 31st altercation outside of Plaintiff's cell, expanded upon by Plaintiff's *Spears* testimony, state viable Eighth Amendment excessive force claims against Deputies Knox and Dennis, Lieutenant Berrian, and Sergeant Glass requiring further proceedings.  Plaintiff also states an excessive force claim against Officer Johnson, however, Plaintiff ***has not*** named Officer Johnson as a defendant in this matter.  Assuming the truth of Harris's allegations, Deputy Dennis's use of force in the October 19th altercation occurred while Plaintiff was handcuffed for some portion of the altercation; the officers' use of force in the October 31st altercation outside of Plaintiff's cell occurred while Plaintiff was handcuffed during the entire altercation; and the facts regarding Plaintiff's restraint during the October 31st infirmary tasing by Sergeant Glass are unclear.

I cannot determine from the current record whether Harris was merely non-compliant with a procedural order or was aggressively threatening or escalating in his resistance to the officers in a way that might have justified the force used in the three incidents.  I further cannot conclude as a pleading matter that Harris's injuries were merely *de minimis*.  As the case law outlined above demonstrates, such fact allegations are frequently held sufficient to survive the screening stage of these kinds of cases.

For the foregoing reasons, I recommend that Plaintiff's excessive force claims against Deputies Dennis and Knox, Lieutenant Berrian and Sergeant Glass not be dismissed at this time and that they be preserved for further proceedings.

---

his back, yanked his hands through the tray slot opening of his cell, beat and punched on his arms, and punched him in the face).

## I. **Harassing, Belittling, and Profane Comments by Deputy Dennis Are Not Constitutional Violations**

Plaintiff alleges that Deputy Dennis made belittling, harassing, and profane comments against him on October 19, 2019.  Rude or insensitive behavior towards prisoners is disgraceful conduct, but it does not alone rise to the level of deliberate indifference.[85]  Moreover, "mere threatening language and gestures" by prison staff, while inappropriate, do not alone violate the Eighth Amendment.[86]  Accordingly, Plaintiff cannot premise his § 1983 claim on alleged rude or disrespectful comments by prison personnel.  Accordingly, that claim is subject to dismissal on the basis of frivolousness and failure to state a claim.[87]

## J. **Failure to Protect Claims Against Non-Defendants Sergeant Drullet, Officer Coleman, and Deputy Holmes**

Under the Eighth Amendment, prison officials have a duty "to protect prisoners from violence at the hands of other prisoners."[88]  To establish a violation of this right, a prisoner must show (1) "he is incarcerated under conditions posing a substantial risk of serious harm," and (2) the prison official acted with "deliberate indifference to inmate health and safety."[89]  This is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. . . . The "deliberate indifference" standard permits courts to separate omissions that "amount to an intentional choice" from those that are merely "unintentionally negligent oversight[s]."[90]

---

[85] *Hollyfield v. Hurst*, 796 F. App'x 817, 820–21 (5th Cir. 2019) (citing *Atkins v. Lofton*, 373 F. App'x 472, 473 n.1 (5th Cir. 2010); *see also Brown v. Plata*, 563 U.S. 493, 510 (2011) ("Prisoners retain the essence of human dignity inherent in all persons.")).

[86] *Hollyfield*, 796 F. App'x at 820–21 (citing *Robertson v. Plano City of Tex.*, 70 F.3d 21, 24 (5th Cir. 1995) (citation omitted)); *see also Gibson v. Jean-Baptist*, 802 F. App'x 858, 859 (5th Cir. 2020) (same).

[87] 28 U.S.C. § 1915(e)(2) and 42 U.S.C. § 1997e(c)(1).

[88] *Williams v. Hampton*, 797 F.3d 276, 280 (5th Cir. 2015) (en banc) (quoting *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)).

[89] *Williams*, 797 F.3d at 280 (quoting *Farmer*, 511 U.S. at 834).

[90] *Southard v. Tex. Bd. of Crim. Justice*, 114 F.3d 539, 551 (5th Cir. 1997) (citing *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997)) (additional citations and footnote omitted) (emphasis added). "'Subjective recklessness,'

33

Only deliberate indifference, "an unnecessary and wanton infliction of pain or acts repugnant to the conscience of mankind," constitute conduct proscribed by the Eighth Amendment.[91]  To establish deliberate indifference a plaintiff must show a defendant had actual knowledge of a substantial risk to inmate health or safety,[92] by demonstrating (1) the prison official was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and (2) the official "must also draw the inference."[93]  "Mere negligence or a failure to act reasonably is not enough.  The officer must have the subjective intent to cause harm."[94]  If the court finds that one of the components of the test is not met, it need not address the other component.[95]

Plaintiff's written submissions and testimony allege that Sergeant Drullet failed to protect him from Deputy Dennis's use of force during the October 19th altercation and merely stood by and watched the incident unfold.  Similarly, Plaintiff's allegations and testimony indicate that Officer Coleman and Deputy Holmes were present during the October 31st altercation outside of Plaintiff's cell, and the statements submitted by Plaintiff's fellow inmates indicate that these officers stood by and failed to intervene during Lieutenant Berrian and Deputy Knox's use of force against a handcuffed and defenseless Plaintiff.  However, Plaintiff does not state a § 1983 against these individuals because ***he has not*** named Sergeant Drullet, Officer Coleman, or Deputy Holmes as defendants in this matter.

---

as used in the criminal law, is the appropriate test for deliberate indifference." *Norton*, 122 F.3d at 291; *accord Williams*, 797 F.3d at 281.

[91] *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976); *accord Gregg v. Georgia*, 428 U.S. 153, 182–83 (1976).

[92] *Id.* at 281.

[93] *Id.* (quoting *Farmer*, 511 U.S. at 837)).

[94] *Mace v. City of Palestine*, 333 F.3d 621, 626 (5th Cir. 2003).

[95] *Davis*, 157 F.3d at 1005.

K. **Inadequate Medical Care**

Plaintiff alleges generally in his amended complaint that he received inadequate medical care while incarcerated in JPCC, including denial of access to a social worker.  Plaintiff alleges that he was originally a convicted prisoner, but his criminal conviction was reversed, and he was granted a new criminal trial during his JPCC incarceration.  Thus, it appears that Plaintiff was both a pretrial detainee and a convicted prisoner during the entire time period about which he complains. The Fifth Circuit explained in *Hare v. City of Corinth*, 74 F.3d 633 (5th Cir. 1996):[96]

> (1) that the State owes the same duty under the Due Process Clause and the Eighth Amendment to provide both pretrial detainees and convicted inmates with basic human needs, including medical care and protection from harm, during their confinement; and (2) that a state jail official's liability for episodic acts or omissions cannot attach unless the official had subjective knowledge of a substantial risk of serious harm to a pretrial detainee but responded with deliberate indifference to that risk.[97]

The Fifth Circuit explained that for the "reasonable relationship" test under *Bell v. Wolfish,* 441 U.S. 520, 539 (1979),  to apply, the pretrial detainee must be able to show that a prison official's act either "implement[s] a rule or restriction or otherwise demonstrate[s] the existence of an identifiable intended condition or practice" or that the "official's acts or omissions were sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by other officials, to prove an intended condition or practice."[98]  If the pretrial detainee is unable to

---

[96] Before *Hare*, it appeared that prison officials must provide pretrial detainees with reasonable medical care unless the failure to provide it was reasonably related to a legitimate government interest. *Bell v. Wolfish*, 441 U.S. 520, 539 (1979); *Cupit v. Jones*, 835 F.2d 82, 85 (5th Cir. 1987); *Mayweather v. Foti*, 958 F.2d 91 (5th Cir. 1992).  The inquiry was "whether the denial of medical care . . . was objectively reasonable in light of the Fourteenth Amendment's guarantee of reasonable medical care and prohibition on punishment of pretrial detainees." *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1186 (5th Cir. 1990), *abrogated on other grounds as recognized in Martin v. Thomas*, 973 F.2d 449, 455 (5th Cir. 1992).
[97] *Hare*, 74 F.3d at 650.
[98] *Id.* at 645.

prove either, the incident is considered an episodic act or omission, subject to the deliberate indifference standard enunciated in *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).[99]

In *Estelle*, the Supreme Court held that a convicted prisoner may succeed on a claim for damages under § 1983 for inadequate medical care only if he demonstrates that there has been "deliberate indifference to serious medical needs" by prison officials or other state actors. Only deliberate indifference, "an unnecessary and wanton infliction of pain . . . or acts repugnant to the conscience of mankind," constitutes conduct proscribed by the Eighth Amendment.[100] Such indifference may be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed."[101] "Deliberate indifference" means that a prison official is liable "only if he knows that the inmates face a substantial risk of serious harm and [he] disregards that risk by failing to take reasonable measures to abate it."[102] This definition, as articulated by the Supreme Court in *Farmer*, applies to Eighth Amendment medical claims.[103]

An inmate must satisfy two requirements to demonstrate that a prison official has violated the Eighth Amendment. If the court finds that one of the components of the test is not met, it need not address the other component.[104] "First, the deprivation alleged must be, objectively, 'sufficiently serious;' a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities."[105] Thus, Plaintiff must show that Defendants "exhibited

---

[99] *Shepherd v. Dallas County*, 591 F.3d 445, 452 (5th Cir. 2009) (citing *Bell*, 441 U.S. at 539; *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997); *Hare*, 74 F.3d at 649); *Tamez v. Manthey*, 589 F.3d 764, 769–70 (5th Cir. 2009) (citing *Scott*, 114 F.3d at 53; *Hare*, 74 F.3d at 649).

[100] *Estelle*, 429 U.S. at 105–06; *accord Gregg v. Georgia*, 428 U.S. 153, 182–83 (1976); *Tamez*, 589 F.3d at 770; *Hare*, 74 F.3d at 650.

[101] *Estelle*, 429 U.S. at 104–05.

[102] *Farmer v. Brennan*, 511 U.S. 825, 847 (1994).

[103] *Reeves*, 27 F.3d at 176.

[104] *Davis*, 157 F.3d at 1005.

[105] *Farmer*, 511 U.S. at 834 (quotation omitted).

deliberate indifference to his serious medical needs."[106]  In addition, plaintiff must establish that defendant possessed a culpable state of mind.[107]  A prison official cannot be held liable "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."[108]  "Such a showing requires the inmate to allege that prison officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'"[109]

> The Supreme Court has recently reaffirmed that "'deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." . . . The "deliberate indifference" standard permits courts to separate omissions that amount to an intentional choice from those that are merely unintentionally negligent oversight[s].[110]

"'Subjective recklessness,'" as used in the criminal law, is the appropriate test for deliberate indifference."[111]

Plaintiff's pleadings, as expanded by his *Spears* testimony, establish that only episodic acts or omissions, as defined in *Hare,* are at issue.[112]  Therefore, the "deliberate indifference" standard applies, and plaintiff must allege facts sufficient to establish that Defendants knew he faced a substantial risk of harm and disregarded that risk by failing to take reasonable measures to abate

---

[106] *Cooper v. Johnson*, 353 F. App'x 965, 967 (5th Cir. 2009) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)); *accord Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999); *Mendoza v. Lynaugh*, 989 F.2d 191, 193 (5th Cir. 1993).

[107] *Farmer*, 511 U.S. at 838 (citing *Wilson*, 501 U.S. at 298).

[108] *Id.* at 837; *accord Tamez*, 589 F.3d at 770 (citing *Thompson v. Upshur County*, 245 F.3d 447, 458–59 (5th Cir. 2001)).

[109] *Brewster v. Dretke*, 587 F.3d 764, 770 (5th Cir. 2009) (quoting *Domino v. Texas Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001)) (emphasis added), *cert. denied*, 130 S. Ct. 3368 (2010).

[110] *Southard v. Texas Bd. of Crim. Justice*, 114 F.3d 539, 551 (5th Cir. 1997) (quoting *Board of County Comm'rs v. Brown*, 520 U.S. 397, 410 (1997) (other quotations omitted)) (emphasis added); *accord Tamez*, 589 F.3d at 770.

[111] *Norton v. Dimazana*, 122 F.3d 286, 291 (5th Cir. 1997).

[112] *See Tamez*, 589 F.3d at 770 (defendants' alleged refusal "to provide [prisoner] with immediate medical treatment qualifies as an 'episodic act or omission'").

it. Plaintiff wholly fails to allege facts sufficient to satisfy the stringent "deliberate indifference" standard.

Even assuming, without concluding, that Plaintiff's pain and injuries following the alleged physical altercations and tasings on October 19 and 31, 2019, presented serious medical needs for constitutional purposes, Plaintiff has alleged facts, confirmed by his testimony and verified medical records, that negate any inference of deliberate indifference by JPCC medical personnel. Indeed, the record indicates that he received constitutionally adequate medical care while incarcerated in JPCC.

Plaintiff's verified medical records indicate that he received an off-site rhinoplasty at UMC based on a closed fracture of the nasal bone on September 23, 2019. ECF. Nos. 24-13, at 6; 24-13, at 17. When he suffered post-surgical bleeding, JPCC medical personnel sent him to the UMC emergency room for evaluation and replacement of compression packing on his nose on September 24, 2019. ECF. No. 24-13, at 6. In the weeks following his rhinoplasty, JPCC medical personnel housed Plaintiff in the "Special Needs Unit," monitored Plaintiff's bleeding and complaints of pain at the surgical site, administered deep sea nasal spray, hydrocodone/acetaminophen (Norco), and ice packs to Plaintiff for nasal pain, and brought him to UMC for follow-up appointments with his oral maxiofacial surgeon. *Id.* at 6–34. JPCC medical personnel noted Plaintiff's physical improvement over time and discharged him to general population on October 2, 2019. *Id.* Plaintiff also visited David Jennings, a Licensed Clinical Social worker, for a mental health evaluation on September 30, 2019. *Id.* at 34–36.

On October 20, 2019, Plaintiff was brought to the JPCC infirmary after he reported that he had been tased by deputies the previous day. ECF No. 24-11, at 5. Medical notes indicate that plaintiff had three small prong marks to his middle abdominal area, swollen hands that were painful

to the touch, pain in the left shoulder and reports of a previous rotator cuff injury. *Id.* JPCC medical personnel applied topical antibiotic ointment to Plaintiff's abdomen. *Id.*

On October 31, 2019, JPCC medical personnel referred plaintiff to UMC for an emergency evaluation and CT scan following the altercation outside of his cell and subsequent infirmary tasing. ECF Nos. 24-2, at 13; 24-14, at 5. UMC medical personnel found that Plaintiff's CT scan showed no fracture to the cervical spine, diagnosed him with a nasal laceration and fracture and neck pain, and gave him a C-collar for comfort and pain relief. ECF No. 24-14, at 5. Plaintiff returned from UMC on or about November 1, 2019, and was housed in the prison infirmary, where he received an examination from a JPCC nurse, who noted that he had tolerable pain, his nasal bridge sutures were dry and intact, and he had a desire to return to regular prison population – despite being given the option to remain in the infirmary for observation and pain control. *Id.*

On November 2, 2019, Plaintiff was given two Tylenol for face pain and was discharged to the general population housing unit with mid-nasal swelling and purplish discoloration under both eyes, and signed a form in which he refused to wear his C-collar while housed in general population. ECF Nos. 24-4, at 5; 24-10, at 3; 24-14, at 22, 60–61. Plaintiff's Tylenol prescription was continued on November 11, 2019. ECF No. 24-2 at 15. Plaintiff was taken to follow-up appointments with his UMC oral maxiofacial surgeon on November 3 and 25, 2019. ECF No. 24-11, at 5 at 24-10, at 4. Plaintiff visited Social Worker Jennings for mental health evaluations on December 9 and 11, 2019. ECF No. 24-2, at 36–38.

Before Plaintiff was transferred out of JPCC, he received a medical screening on February 10, 2020, follow-up care for a CT scan of neck and sinuses, and visited an ear, nose, and throat doctor. ECF No. 24-15.

Plaintiff does not allege that medical personnel at JPCC and/or UMC refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in conduct that would clearly evince a wanton disregard for any serious medical needs.[113]  Plaintiff's medical treatment and surgical procedure was provided by JPCC and/or UMC medical staff, and Plaintiff alleges no fact to show that a substantial risk of serious harm to his health or safety would result from any medical procedure or that medical personnel had knowledge of such a risk and ignored it.

Contentions that amount to a mere disagreement with the speed, quality, or extent of medical treatment, or even negligence, do not give rise to a § 1983 claim. "[A]lthough inadequate medical treatment may, at a certain point, rise to the level of a constitutional violation, malpractice or negligent care does not."[114]  Here, Plaintiff's complaints about his medical care fail to state a claim of violation of his constitutional rights as necessary to obtain relief under § 1983 because he cannot establish deliberate indifference under the applicable constitutional standard. Thus, Plaintiff's complaints about his medical care must be dismissed as frivolous and/or for failure to state a claim for relief.[115]

## L.  Conditions of Confinement

Plaintiff's written allegations concerning unsanitary conditions during his incarceration in the JPCC.  Harris was a convicted prisoner and a pretrial detainee during the time period that forms the basis of his claims in this case.  Regardless whether an inmate is a pretrial detainee or a

---

[113] *Brewster*, 587 F.3d at 770.

[114] *Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir. 1999) (citation omitted) (active treatment of prisoner's serious medical condition, which ultimately resulted in death, does not constitute deliberate indifference, even if treatment was negligently administered); *accord Rowe v. Norris*, 198 F. App'x 579, 2006 WL 2711945, at *2 (8th Cir. 2006) (no constitutional violation when inmate disagreed with physician's choice of medication); *Marksberry v. O'Dea*, 173 F.3d 855, 1999 WL 98533, at *2 (6th Cir. Jan. 28, 1999) (plaintiff who alleged inadequate treatment for broken hand failed to state constitutional violation, when he was examined by physician and received x-rays and medication); *Williams v. Browning*, 2006 WL 83433, at *1, *3 (S.D. Tex. Jan. 11, 2006) (inmate with diabetes, hypertension, anxiety and chronic knee ailment who alleged that he was unable to obtain his medications timely, but did not establish any substantial harm from the delay, failed to state a claim for deliberate indifference).

[115] 28 U.S.C. § 1915(e)(2); 42 U.S.C. § 1997e(c)(1).

convicted prisoner, the standard of liability is the same for episodic acts or omissions of jail

officials of the type alleged in this case.[116]  In *Hare*, the Fifth Circuit held

> (1) that the State owes the same duty under the Due Process Clause and the Eighth
> Amendment to provide both pretrial detainees and convicted inmates with basic
> human needs, including medical care and protection from harm, during their
> confinement; and (2) that a state jail official's liability for episodic acts or omissions
> cannot attach unless the official had subjective knowledge of a substantial risk of
> serious harm to a pretrial detainee but responded with deliberate indifference to that
> risk.[117]

Here, nothing in Plaintiff's written submissions or *Spears* testimony leads to an inference

that the conditions he described were the result of a prison official's act either "implement[ing] a

rule or restriction or otherwise demonstrat[ing] the existence of an identifiable intended condition

or practice" or that the "official's acts or omissions were sufficiently extended or pervasive, or

otherwise typical of extended or pervasive misconduct by other officials, to prove an intended

condition or practice."[118]  Thus, the complained-of harm is a particular act or omission of one or

more officials, and the deliberate indifference standard enunciated in *Estelle v. Gamble*, 429 U.S.

97, 104 (1976), applies.[119]

Applying this standard, Harris's allegations do not constitute violations of the Constitution.

Two requirements must be met before § 1983 liability will arise for constitutional violations

relating to conditions of confinement of the type plaintiff described.

First, the alleged deprivation must objectively be "sufficiently serious," which means that

"the inmate must show that he is incarcerated under conditions posing a substantial risk of serious

harm."[120]  To rise to the level of a constitutional violation, the conditions must be "'so serious as

---

[116] *McCarty v. Zapata County*, 243 F. App'x 792, 2007 WL 1191019, at *1 (5th Cir. Apr. 20, 2007) (citing *Gibbs v. Grimmette*, 254 F.3d 545, 547 (5th Cir. 2001); *Hare v. City of Corinth*, 74 F.3d 633, 636 (5th Cir. 1996)); *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 526 (5th Cir. 1999).
[117] *Hare*, 74 F.3d at 650.
[118] *Id.* at 645.
[119] *Olabisiomotosho*, 185 F.3d at 526; *Tamez v. Manthey*, 2009 WL 4324808, at *4 (5th Cir. 2009).
[120] *Farmer v. Brennan*, 511 U.S. 825, 847 (1994).

41

to deprive [plaintiff] of the minimal measure of life's necessities,' in this case the basic human need for sanitary conditions."[121]  Second, the inmate must show that a prison official was deliberately indifferent to inmate health or safety.[122]  A prison official cannot be held liable "unless the official *knows of and disregards an excessive risk to inmate health or safety*; the official *must both be aware of facts* from which the inference could be drawn that a substantial risk of serious harm exists, and *he must also draw the inference*."[123]

> The Supreme Court has recently reaffirmed that "'deliberate indifference' is a *stringent* standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." . . . The "deliberate indifference" standard permits courts to separate omissions that amount to an intentional choice from those that are merely unintentionally negligent oversight[s].[124]

"'Subjective recklessness,'" as used in the criminal law, is the appropriate test for deliberate indifference."[125]

Harris's written allegations and testimony meet neither of these two requirements. The conditions described by plaintiff – feces on the wall, cold food, hot water, bug and rodent infestation – while plainly not comfortable or pleasant, do not rise to a level of seriousness constituting a constitutional violation.  Harris neither alleged in his written submissions nor testified during the *Spears* hearing that he has suffered physical injury or illness as a result of the allegedly unsanitary conditions. Thus, he alleges no serious harm or risk of serious harm in the constitutional sense, and the court can perceive none under the circumstances described in plaintiff's testimony and written submissions.

---

[121] *Alexander v. Tippah County*, 351 F.3d 626, 630 (5th Cir. 2003) (quoting *Woods v. Edwards*, 51 F.3d 577, 581 (5th Cir. 1995)).
[122] *Farmer*, 511 U.S. at 847.
[123] *Id.* at 837 (emphasis added).
[124] *Southard v. Tex. Bd. of Crim. Justice*, 114 F.3d 539, 551 (5th Cir. 1997) (quoting *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 410 (1997) (other quotations omitted)) (emphasis added).
[125] *Norton*, 122 F.3d at 291 (citing *Farmer*, 511 U.S. at 838–40).

Short-term sanitation problems, although admittedly unpleasant, do not amount to constitutional violations. *Whitnack v. Douglas County*, 16 F.3d 954, 958 (8th Cir. 1994); *Knop v. Johnson*, 977 F.2d 996, 1013 (6th Cir. 1992); *Robinson v. Illinois State Corr. Ctr.*, 890 F. Supp. 715, 720 (N.D. Ill. 1995). "[J]ails must provide only reasonably adequate hygiene and sanitation conditions."[126]    Serving time in prison "is not a guarantee that one will be safe from life's occasional inconveniences."[127]    Courts have repeatedly held "that the Constitution does not mandate prisons with comfortable surroundings or commodious conditions."[128]    Harris's allegations about dirty conditions at JPCC fail to establish constitutional violations.[129]

In two cases, the Fifth Circuit has held that extreme, virtually permanent conditions of cells that contained excrement and other filth violate the Eighth Amendment. In *Harper v. Showers*, 174 F.3d 716, 716 (5th Cir. 1999), there were "continual" conditions of "filthy, sometimes feces-smeared cells," and in *Gates v. Cook*, 376 F.3d 323, 338 (5th Cir. 2004), there were "'extremely filthy' [cells] with crusted fecal matter, urine, dried ejaculate, peeling and chipping paint, and old food particles on the walls." By contrast, in *Davis*, the Fifth Circuit found no constitutional violation when a prisoner was locked in a "management cell" for three days, where the cell was, "according to Davis, 'just filthy, with 'blood on the walls and excretion on the floors and bread

---

[126] *Burton v. Cameron County*, 884 F. Supp. 234, 241 (S.D. Tex. 1995) (citing *Green v. Ferrell*, 801 F.2d 765, 771 (5th Cir. 1986)); *accord Benshoof v. Layton*, 2009 WL 3438004, at *4 (10th Cir. Oct. 27, 2009); *Gates v. Cook*, 376 F.3d 323, 342 (5th Cir. 2004).

[127] *Holloway v. Gunnell*, 685 F.2d 150, 156 (5th Cir. 1982).

[128] *Talib v. Gilley*, 138 F.3d 211, 215 (5th Cir. 1998) (citing *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)); *accord Hernandez*, 522 F.3d at 560.

[129] *See Davis*, 157 F.3d at 1006 (no constitutional injury when plaintiff was confined in "filthy" cell) (citing *Smith v. Copeland*, 87 F.3d 265, 269 (8th Cir. 1996) (no constitutional violation when prisoner was exposed for four days to raw sewage from overflowed toilet in his cell)); *Davis v. St. Charles Parish Corr. Ctr.*, 2010 WL 890980, at *9 (E.D. La. Mar. 8, 2010) (citing *Talib*, 138 F.3d at 215); *Wilson v. Lynaugh*, 878 F.2d 846, 849 & n.5 (5th Cir. 1989)) (Inmate who complained of "unsanitary practice[s]," including inadequate ventilation, unsanitary water fountains, 52 inmates using one ice cooler, rest room four feet from the dining area, toilets leaking water and unsanitized living quarters, failed to state a claim. "Simply because [plaintiff's] dorm is less sanitary than he would like does not render the conditions unconstitutional.").

loaf on the floor.'"[130]  The appeals court quoted the Supreme Court's holding that "'the length of confinement cannot be ignored. . . . A filthy, overcrowded cell . . . might be tolerable for a few days and intolerably cruel for weeks or months.'"[131]  The Fifth Circuit found that "Davis did not suffer an extreme deprivation of any 'minimal civilized measure of life's necessities'" when he was confined in the cell for only three days.[132]

As to plaintiff's allegations of bugs and rodents, "[t]he presence of pests, by itself, is not a constitutional violation."[133]  As to his complaints about cold food and hot water, constitutional standards require only that prison authorities provide an inmate with "sufficient nutritional value to preserve health."[134] The Constitution does not require that convicted inmates be provided with food at particular temperatures or every culinary amenity which one may find desirable.[135]

---

[130] *Davis*, 157 F.3d at 1004, 1006.

[131] *Id.* at 1006 (quoting *Hutto v. Finney*, 437 U.S. 678, 686–87 (1978)).

[132] *Id.* (quoting *Wilson v. Seiter*, 501 U.S. 294, 304 (1991)).

[133] *Walker v. Davis*, 2019 WL 2465298, at *13 (E.D. Tex. Jan. 10, 2019), *report and recommendation adopted sub nom.*, *Walker v. Collier*, 2019 WL 1421152 (E.D. Tex. Mar. 28, 2019) (citing *Morrison v. Bench*, 2009 WL 4858066 (N.D. Tex., December 14, 2009) (claim was frivolous where prisoner was placed in solitary confinement and required to relocate to cells at the end of the building which were infested with bugs and mosquitos); *Bush v. Monroe*, 2018 WL 4042418 (E.D. Tex., August 24, 2018) (living in a leaky cell with insects, broken doors, and rust may be undesirable and uncomfortable but is not itself a constitutional violation) (other citations omitted); *see also Waller La v. Ward*, 2016 WL 7235832, at *3 (W.D. La. Oct. 19, 2016), *report and recommendation adopted sub nom. La v. Ward*, 2016 WL 7240152 (W.D. La. Dec. 14, 2016) (citing *Simmons v. Gusman*, 2015 WL 151113, at *4 (E.D. La., Jan. 12, 2015); *Clark v. Gusman*, 2012 WL 1825306, at *5 (E.D. La. Mar. 29, 2012), *report and recommendation adopted*, 2012 WL 1825302 (E.D. La. May 18, 2012); *Murray v. Edwards County Sheriff's Department*, 453 F.Supp.2d 1280, 1292 (D. Kan. 2006), *aff'd*, 248 F. App'x 993 (10th Cir. 2007); *Smith v. Barber*, 316 F. Supp. 2d 992, 1028–29 (D. Kan. 2004)).

[134] *Pitt v. Weaver*, 2015 WL 2452348, at *4 (E.D. La. May 21, 2015) (quoting *Eason v. Thaler*, 73 F.3d 1322, 1327 (5th Cir.1996); *Smith v. Sullivan*, 553 F.2d 373, 380 (5th Cir. 1977)); *Berry v. Brady*, 192 F.3d 504, 507 (5th Cir. 1999); *Green v. Farrell*, 801 F.2d 765, 770 (5th Cir. 1986) (quoting *Sullivan*, 553 F.2d at 380).

[135] *Wolfish v. Levi*, 573 F.2d 118, 125 (2d Cir. 1978), *rev'd. on other grounds sub nom.*, *Bell v. Wolfish*, 441 U.S. 520 (1979) (citing *Newman*, 559 F.2d at 291); *Murray v. Matty*, 1985 WL 4948 at *1 (E.D. Pa. 1985); *see McGarrah v. Kimbrow*, 2015 WL 105228, at *5 (N.D. Tex. Jan. 6, 2015) (". . . [t]he fact that food was served cold or at improper temperatures does not rise to a constitutional deprivation.") (citing *Hamm v. DeKalb CTY.*, 774 F.2d 1567, 1575 (11th Cir. 1985) ("The fact that the food occasionally contains foreign objects or sometimes is served cold, while unpleasant, does not amount to a constitutional deprivation."), *cert. denied*, 475 U.S. 1096 (1986)); *Hunt v. Carver*, 2019 WL 7486810, at *5 (S.D. W. Va. Nov. 7, 2019) ("[t]o the extent Plaintiff complains of being served cold food, such is insufficient to state a constitutional claim."), *report and recommendation adopted in part*, 2020 WL 61175 (S.D. W. Va. Jan. 6, 2020), *and report and recommendation adopted*, 2020 WL 1465905 (S.D. W. Va. Mar. 20, 2020); *McCoy v. Good*, 255 F. Supp. 2d 233, 260 (S.D.N.Y. 2003) (denial of warm food is not, by itself, a deprivation of the minimal civilized measure of nutrition so as to support prisoner's Eighth Amendment claim challenging conditions of confinement; *Abdul-Akbar v. Dep't of Corrs.*, 910 F. Supp. 986, 1006 (D. Del. 1995), *aff'd.* 111 F.3d 125 (3d Cir.

When compared to the conditions described by the Fifth Circuit in the foregoing cases, the much less objectively unsanitary conditions described by Harris do not rise to the level of a constitutional violation. The conditions he experienced in JPCC were neither virtually permanent nor an extreme deprivation of the type that might offend the Constitution. He does not allege that he suffered any physical injuries or ailments as a result of any allegedly unsanitary conditions. Under these circumstances, Plaintiff cannot state a cognizable §1983 claim that defendants are responsible for constitutionally inadequate conditions of confinement. For the foregoing reasons, plaintiff's complaints in this case about the conditions of his confinement advance a legally frivolous argument and fail to state a claim for relief under §1983.

## M. Lack of Exercise

Plaintiff's amended complaint alleges that he received "no exercise" during his JPCC incarceration. The Fifth Circuit "has held that deprivation of exercise may constitute an *impairment of health*, which is actionable under the Eighth Amendment, and that the absence of outdoor exercise opportunities may constitute an Eighth Amendment violation."[136] "While neither the Fifth Circuit nor the United States Supreme Court has ever specifically held that inmates enjoy an *absolute* right to out-of-cell exercise, the Fifth Circuit has repeatedly held that an extended deprivation of exercise opportunities *might* impinge upon an inmate's Eighth Amendment rights depending upon the particular facts of a given case."[137]

However, it is clear that inmates have no protected liberty interest in specific or any particular amount of outdoor recreational opportunities, and the "[d]eprivation of exercise is not a

1997) (prison officials did not violate the Eighth Amendment where an inmate alleged that officials served cold meals on unsanitary carts because inmate failed to demonstrate that he was denied an "identifiable human need").

[136] *Hewitt v. Henderson*, 271 F. App'x 426, 428 (5th Cir. 2008) (citations omitted) (emphasis added).
[137] *Doolittle v. Holmes*, 2010 WL 22552, at *4 (M.D. La. Jan. 4, 2010) (citing *Hewitt*, 271 F. App'x at 428; *Green*, 801 F.2d 765; *McGruder v. Phelps*, 609 F.2d 1023 (5th Cir. 1979)) (emphasis in original).

per se constitutional violation."[138]  To succeed on a claim under § 1983 for lack of exercise, a prisoner must establish "the existence of any health hazard under the specific circumstances involved."[139]

Conditions of confinement may rise to the level of a constitutional violation only if they result in "a serious or significant . . . injury resulting from the challenged conditions."[140]  Nothing supports the conclusion that Plaintiff's lack of exercise caused him to suffer any health impairment that was serious or even related to lack of recreation, and his claim should be dismissed as frivolous and/or for failure to state a claim upon which relief can be granted.[141]

## RECOMMENDATIONS

Accordingly, for the foregoing reasons,

IT IS RECOMMENDED that Plaintiff's Motion for Preliminary Injunction (ECF No. 13) and the claims for injunctive relief asserted in his complaint should be DISMISSED AS MOOT based on his transfer out of the Jefferson Parish Correctional Center.

IT IS FURTHER RECOMMENDED that Plaintiff's excessive force and failure to protect claims against Deputies Dennis and Knox, Lieutenant Berrian, and Sergeant Glass **not** be dismissed at this time because Plaintiff states valid claims against these Defendants under § 1983 and that further proceedings be conducted as to these claims.IT IS FURTHER RECOMMENDED that Plaintiff's claim against Deputy Dennis for allegedly charging Plaintiff with criminal offenses

---

[138] *Lewis v. Smith*, 277 F.3d 1373, 2001 WL 1485821, at *1 (5th Cir. 2001) (citing *Stewart v. Winter*, 669 F.2d 328, 336 n.19 (5th Cir. 1982); *Miller v. Carson*, 563 F.2d 741, 751 n.12 (5th Cir. 1977)); *accord Sampson v. Corrs. Corp.*, 2009 WL 837640, at *16 (W.D. La. Mar. 26, 2009) (citing *Smith v. Boyd*, 945 F.2d 1041, 1043 (8th Cir. 1991); *Lato v. Attorney Gen.*, 773 F. Supp. 973, 978 (W.D. Tex. 1991) (citing *Beck v. Lynaugh*, 842 F.2d 757, 762 (5th Cir. 1988)).
[139] *Ruiz v. Estelle*, 679 F.2d 1115, 1152 (5th Cir.), *amended in part, vacated in part on other grounds*, 688 F.2d 266 (5th Cir. 1982); *accord Delaney v. DeTella*, 256 F.3d 679, 684 (7th Cir. 2001); *Green*, 801 F.2d at 771.
[140] *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir.), *cert. denied*, 114 S. Ct. 393 (1993) (emphasis added); *accord White v. Gregory*, 1 F.3d 267, 269 (4 Cir. 1993), *cert. denied*, 114 S. Ct. 931 (1994).
[141] 28 U.S.C. § 1915(e)(2); 42 U.S.C. § 1997e(c)(1).

without *Miranda* warning, intake procedures, or Magistrate hearing be STAYED pending resolution of his underlying state court criminal proceeding.

IT IS FURTHER RECOMMENDED that all of Plaintiff's remaining claims be DISMISSED WITH PREJUDICE as legally frivolous and/or for failure to state a claim pursuant to 28 U.S.C. § 1915(e)(2) and/or 42 U.S.C. § 1997e(c)(1).

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.[142]

New Orleans, Louisiana, this _____13th_____ day of August, 2020.

_____
DONNA PHILLIPS CURRAULT
UNITED STATES MAGISTRATE JUDGE

---

[142] *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)). *Douglass* referred to the previously applicable ten-day period for filing of objections, which was extended to fourteen days by amendment effective December 1, 2009, 28 U.S.C. § 636(b)(1).